1          UNITED STATES DISTRICT COURT
          MIDDLE DISTRICT OF TENNESSEE
2              NASHVILLE DIVISION

3
UNITED STATES OF AMERICA        )
4                               )
vs                              )        Case No. 3:24-cr-00178-1
5                               )
REYNALDO SALINAS-CRUZ           )
6  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
7

8
                    BEFORE THE HONORABLE
9
             ALETA A. TRAUGER, DISTRICT JUDGE
10
                TRANSCRIPT OF PROCEEDINGS
11
                   November 12, 2024
12

13
   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
14
APPEARANCES:
15
For the Government:        Joshua A. Kurtzman
16                         US Attorney's Office
                           719 Church Street
17                         Suite 3300
                           Nashville, TN  37203
18
For the Defendant:         Mary K. Harcombe
19                         Federal Public Defender's Office
                           810 Broadway
20                         Suite 200
                           Nashville, TN  37203
21
Interpreter:               Judith Kristy
22

23 Patricia A. Jennings, RMR, CRR
   Official Court Reporter
24 719 Church Street, Suite 2300
   Nashville, TN 37203
25 patty_jennings@tnmd.uscourts.gov

1    The above-styled cause came to be heard on

2 November 12, 2024, at 2:00 p.m., before the Honorable Aleta

3 A. Trauger, District Judge, when the following proceedings

4 were had, to-wit:

5

6    THE COURT:  Good afternoon.  Let's swear the

7 interpreter, Ms. Kristy.

8    COURTROOM DEPUTY:  Please raise your right hand.

9    (Interpreter sworn.)

10    INTERPRETER:  I do.

11    THE COURT:  All right.  We are here on -- we're

12 here on a change of plea in United States versus Reynaldo

13 Salinas-Cruz.  We have Josh Kurtzman for the government.

14 Good afternoon.

15    MR. KURTZMAN:  Good afternoon, Your Honor.

16    THE COURT:  And Mary Harcombe for

17 Mr. Salinas-Cruz.  I think we'll let him remain where he is

18 so that the interpreter can -- does she need to be next to

19 him, rather than -- does she need to be on the other side of

20 him?  Wouldn't that be better or not?

21    INTERPRETER:  It's not necessary, Your Honor, but

22 it would be perhaps convenient in case he wanted to make any

23 signals to me or --

24    THE COURT:  She can't hear what you're saying.  I

25 think that as long as the equipment is working, it's fine;

1  right?

2          THE INTERPRETER:  It's not necessary as long as we

3  have equipment, but it could be interesting for him to be in

4  between the two of us.

5          MS. HARCOMBE:  She said that that might be easier.

6  I think she has to stay plugged in.  So I guess he and I will

7  move over.

8          THE COURT:  Okay.  Why can't he just scoot over,

9  and --

10          MS. HARCOMBE:  Oh, you're right.

11          THE COURT:  -- you sit where he's sitting?  Okay.

12  You're too young to have a slip like that, Ms. Harcombe.

13          MS. HARCOMBE:  Good point.  I'm so used to sitting

14  on that side of my client --

15          THE COURT:  I see.  Okay.

16          MS. HARCOMBE:  -- but in my mind, that's just what

17  we're doing.

18          THE COURT:  All right.  I'm sorry, but...

19          MS. HARCOMBE:  Good thing someone's on top of

20  things today.

21          THE COURT:  Okay.  Well, I try.

22          All right.  Let's swear the defendant.

23          COURTROOM DEPUTY:  Would the defendant please

24  rise.  Raise your right hand.

25          (Defendant sworn.)

```
 1              THE DEFENDANT:  I do.
 2              THE COURT:  Okay.  Be seated.  Should I call him
 3   Mr. Salinas or Mr. Cruz or Mr. Salinas-Cruz?
 4              MS. HARCOMBE:  It's Salinas-Cruz.
 5              THE COURT:  Salinas-Cruz.
 6              MS. HARCOMBE:  So it is -- it is both.
 7              THE COURT:  Okay.  All right.  Mr. Salinas-Cruz,
 8   everything you say in court today is under oath and could be
 9   used against you in a prosecution for committing perjury or
10   making a false statement.
11              Do you understand that?
12              THE DEFENDANT:  Yes.
13              THE COURT:  How far did you go in school?
14              THE DEFENDANT:  Up to sixth grade.
15              THE COURT:  Can you read and write in Spanish?
16              THE DEFENDANT:  Yes.
17              THE COURT:  Some, but not fluently?
18              THE DEFENDANT:  Uh-huh.
19              THE COURT:  Okay.  Mr. Salinas-Cruz, you are
20   charged in an indictment returned by the grand jury in this
21   district on October 2nd of 2024 with the following offenses:
22              Count One charges beginning not later than
23   September of 2023 and continuing through at least May 17 of
24   2024, in this district and elsewhere, you and your
25   co-defendant, Sofia Rodas, conspired to knowingly and
```

1  unlawfully -- they didn't enter into a marriage.  The two

2  defendants didn't enter into a marriage.

3          MR. KURTZMAN:  No, they're charged with conspiracy

4  in Count One, Your Honor.

5          THE COURT:  Conspiracy to have other people enter

6  into a marriage.

7          MS. HARCOMBE:  With a third person.

8          THE COURT:  With a third person.  All right.

9  Well, the indictment is not very artfully worded,

10  Mr. Kurtzman, but I will overlook that for now.

11          MR. KURTZMAN:  Thank you, Your Honor.

12          THE COURT:  All right.  At any rate, that you

13  conspired to knowingly and unlawfully have a third person

14  enter into marriage with yourself for the purpose of evading

15  the immigration laws of the United States.

16          And Count Two charges that on or about October 6th

17  of 2023, you, an alien, a non-citizen of the United States,

18  knowingly and unlawfully entered into marriage for the

19  purpose of evading immigration laws of the United States.

20          Do you feel that you understand this charge --

21  these charges against you?

22          THE DEFENDANT:  Yes.

23          THE COURT:  Have you told your lawyer everything

24  you know about the facts that support these charges against

25  you?

1          THE DEFENDANT:  Yes.

2          THE COURT:  Has she told you what the government

3   would have to prove for you to be found guilty of these

4   charges?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Has she discussed with you any

7   possible defenses you might have?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Has she done all the investigation you

10  have asked her to do?

11         THE DEFENDANT:  Yes.

12         THE COURT:  Are you satisfied with her

13  representation of you so far?

14         THE DEFENDANT:  Yes.

15         THE COURT:  Mr. Salinas-Cruz, these offenses both

16  carry up to five years in prison, a fine of up to $250,000.

17  Count One, the conspiracy charge, carries a supervised

18  release term of up to five years, and Count Two carries -- I

19  guess they're both up to five years.  Yeah, they're both up

20  to five years of -- well --

21         MS. HARCOMBE:  I believe --

22         THE COURT:  They're both up to three years.  I'm

23  sorry.  They're both up to three years of supervised release,

24  and they both have a $100 special assessment.

25         I want to explain a little more about those

penalties to you. We do not have any parole in the federal
system. We have a system of good-time credits that you might
or might not earn, up to 54 days per year. However many days
you earn would be credited at the end of each year and would
shorten your jail time by that much. Any jail time is
followed --

MS. HARCOMBE: I believe the machine stopped
working.

THE COURT: Is it working? Okay. Any jail time
is followed by a period of supervised release, where you
would be reporting to a probation officer and having to
comply with certain conditions. If you violated any of those
conditions, your supervised release could be revoked, and you
could be made to serve additional time in prison.

These offenses carry substantial fines. I must
levy a fine against you, unless I find you are financially
unable to pay a fine. The $100 special assessment must be
paid no matter what your ability is to pay it.

These are felonies you're offering to plead guilty
to. Conviction of a felony may deprive you of the right to
vote, the right to possess a firearm, and these convictions
may be counted as necessary prior convictions in a
prosecution for being a habitual criminal.

Because you are not a citizen of the
United States, I must ask you if you have discussed the

possible immigration consequences of a guilty plea with your
lawyer.

THE DEFENDANT: Yes.

THE COURT: Do you understand that since you are
not a citizen, in addition to the other possible penalties
you are facing, a plea of guilty may subject you to
deportation, exclusion or voluntary departure, and may
prevent you from obtaining US citizenship? Do you understand
that?

THE DEFENDANT: Yes.

THE COURT: Are you presently on probation or
parole from any other offense?

THE DEFENDANT: No.

THE COURT: I want to explain to you the important
constitutional rights you're giving up by pleading guilty.
You have the right to go to trial with the assistance of your
lawyer, who would confront and cross-examine the witnesses on
your behalf. You could not be made to take the stand,
testify, incriminate yourself, call a witness, or put on any
kind of a case at all. It would be the government's sole
burden to prove each and every element of these offenses
beyond a reasonable doubt to the satisfaction of a jury of
12 people. Their verdict would have to be unanimous.

Do you understand that by pleading guilty you're
giving up all of those important constitutional rights?

1          THE DEFENDANT:  Yes.

2          THE COURT:  And do you understand there will be no

3    further trial of any sort, there will just be a sentencing

4    hearing in front of me?

5          THE DEFENDANT:  Yes.

6          THE COURT:  You are proposing to plead guilty to

7    these two offenses without a plea agreement.

8          Is that what you wish to do?

9          THE DEFENDANT:  Yes.

10         THE COURT:  Has anyone promised or suggested to

11   you what sentence I will give you in order to get you to

12   plead guilty?

13         THE DEFENDANT:  Yes.

14         THE COURT:  Let me ask the question again.  Has

15   anyone promised or suggested to you what sentence I will give

16   you in order to get you to plead guilty?

17         THE DEFENDANT:  No.

18         MS. HARCOMBE:  And, Your Honor, I think the

19   confusion was we did talk about the guidelines.  And so I

20   think that that's the --

21         THE COURT:  Okay.  All right.  You understand that

22   the Court must compute the advisory guideline range for your

23   case?  Do you understand that?

24         THE DEFENDANT:  Yes.

25         THE COURT:  But do you understand that those

guidelines are not binding on me?  I can give you a sentence
below the guidelines or a sentence above the guidelines.  Do
you understand that?

           THE DEFENDANT:  Uh-huh.  Yes.

           THE COURT:  Okay.  Has anyone put any kind of
pressure on you, psychological or physical, to get you to
plead guilty?

           THE DEFENDANT:  No.

           THE COURT:  Have you had any alcohol in the last
12 hours?

           THE DEFENDANT:  No.

           THE COURT:  Have you had any narcotics,
hallucinogens or medicine containing narcotics in the last
12 hours?

           THE DEFENDANT:  No.

           THE COURT:  Are you on any medication at all
today?

           THE DEFENDANT:  No.

           THE COURT:  Is your mind clear, and you feel like
you know what you're doing?

           THE DEFENDANT:  Yes.

           THE COURT:  All right.  I'm going to ask all
parties to execute the petition and pass it forward.

           Mr. Salinas-Cruz, have you read -- I know the
petition has been translated into Spanish.  Have you read the

1  entire petition to enter a plea of guilty and do you feel
2  that you understand it?

3              THE DEFENDANT:  Yes.

4              THE COURT:  All right.  If you would sign the
5  petition and pass it forward.

6              MS. HARCOMBE:  Sorry, Judge.  I had it right here,
7  and then I moved.  I can't remember where I put the original
8  copy.  Here it is.

9              THE COURT:  Has Mr. Kurtzman signed it?

10             MS. HARCOMBE:  Yes, ma'am, he has.

11             THE COURT:  All right.  All right.  Mr. Kurtzman,
12  I'll hear the facts.  Don't go too fast.  You got a lot of
13  facts to give here.

14             (Mr. Kurtzman was sworn.)

15             MR. KURTZMAN:  I do.

16             (As read:)  Your Honor, Katia Duenas-Aguilar, a
17  United States citizen, enlisted in the United States Army and
18  was stationed at Fort Campbell in June 2019.  Katia became
19  romantically involved with another soldier and gave birth to
20  a son in April of 2020.  Katia would eventually marry the
21  father of her child, Kendryk, in August 2021.

22             Sometime in 2021, Katia was working part-time at
23  an El Salvadoran restaurant in Clarksville to supplement her
24  military pay and met Sofia Rodas.  Katia and Rodas became
25  friends, and Rodas eventually introduced Katia to Rodas's

boyfriend, Reynaldo Salinas-Cruz.  Salinas-Cruz and Rodas
lived together in a home in Cumberland Furnace, Tennessee,
that they purchased in December of 2020.

In December 2022, Rodas married a soldier, Jeffrey
Thompson, despite the fact that she continued to live in the
home she shared with Cruz.  Based on a review of Rodas's
phone, it does not appear that she ever moved in with
Thompson from when they were married until October 2023, that
she remained romantically involved with Cruz, and this
marriage was likely an effort by Rodas to obtain her
United States citizenship or alter her citizenship status.
On October 26, 2023, Thompson purchased and closed on a house
in Clarksville, and it appears that Rodas and her daughter
planned to move in with him.  On October 28, 2023, Rodas
brought dinner to Thompson's house and spent a few hours with
him.  However, at around 9 p.m., Thompson texted Rodas the
following messages:

9:09 p.m.:  Why did you leave?

9:10 p.m.:  You said you were staying the night.
You said you was tired let's go to bed.  Then we get back
there you tell me to sleep but you just stay on your phone.
You confuse me and tell me stuff you gonna do but we never do
it.

The following day, less than 12 hours after
Thompson sent those texts, Rodas and her daughter returned to

Thompson's house and found him deceased. Thompson had a noose around his neck in the attic of his home, but when found, he was lying on his back with his feet protruding through the ceiling. Despite the fact that Thompson had two children from a previous relationship, he had recently changed the beneficiary of his Soldier's Group Life Insurance, or SGLI, from his children to Rodas. In the week following Thompson's death, Rodas received $600,000. Rodas, who is in the country illegally, obtained a United States tax identification number based on her marriage to Thompson and also inherited the home that Thompson closed on two days before his death.

Katia remained married to the father of her child until September of 2023. Katia would have officially ended the marriage sooner, but she did not have enough money to pay for finalizing the divorce and the custody agreement. Based on evidence from Rodas and Katia's phone, it appears that Rodas provided Katia with money to finalize her divorce on September 22, 2023. On October 6, 2023, 14 days after her divorce was finalized, Katia married Salinas-Cruz in a ceremony that was only attended by Rodas. Rodas's phone has pictures of herself cuddling with Cruz in their shared bed the same day as Cruz's marriage to Katia. Rodas's phone also contains numerous staged photos that were taken in an effort to make the marriage look legitimate. The presence of these

1   pictures is not surprising as Salinas-Cruz told law
2   enforcement in a noncustodial interview, after Katia's death,
3   that his immigration attorney told him that he needed
4   pictures with Katia and her child to provide -- or to prove
5   the legitimacy of his marriage to Katia.

6           At the time Katia married Salinas-Cruz, Katia was
7   sharing a two-bedroom apartment with Miranda Wadsworth.
8   Wadsworth's two children and Katia's son also lived in the
9   apartment.  In law enforcement interviews, Wadsworth related
10   the following information:

11           Katia never mentioned her marriage to Cruz;

12           Cruz never came to the apartment between August
13   2023, when Wadsworth moved into the apartment, and May 15,
14   2024;

15           On Tuesday, May 14, 2024, Rodas came to their
16   shared apartment with boxes and helped Katia pack her
17   belongings;

18           During the same visit, Rodas offered Wadsworth
19   boxes to pack her things and informed Wadsworth that she
20   needed to be out of the apartment by the weekend, that Katia
21   was coming to live with Rodas, and Katia would be gone for an
22   extended period of time due to her military service;

23           The only time Cruz ever came to their shared
24   apartment was on May 15, 2024, two days before Katia was
25   murdered;

1           On May 15, 2024, Cruz helped Katia load her

2    belongings from the apartment onto a trailer because,

3    according to Rodas, Katia and Wadsworth were being evicted;

4           Katia dated a soldier named Dorian Miller from

5    January 2024 until the time of her death; and

6           Dorian Miller regularly came to their shared

7    apartment to spend time with Katia and Kendryk, who's Katia's

8    son.

9           On November 27, 2023, Katia changed the

10   beneficiary to a portion of her SGLI benefit.  The SGLI

11   benefit is broken down into two separate benefits:  An

12   immediate payment of $100,000 to assist with funeral costs

13   and a $500,000 death benefit.  On November 27, 2023, Katia

14   made Salinas-Cruz the beneficiary of the $100,000 portion of

15   her SGLI benefits.  When interviewed after Katia's death,

16   Salinas-Cruz stated that this change was made based on the

17   advice of an immigration attorney who had informed him that

18   his marriage would look more legitimate if he was the

19   beneficiary of his wife's insurance policy.  It is notable at

20   this point that Rodas and Cruz were well aware that a

21   deceased soldier's death benefit is $600,000 if you are the

22   listed beneficiary.  However, at this point, Katia kept her

23   son as the sole beneficiary of her $500,000 death benefit.

24          On February 7, 2024, Rodas texted Katia to

25   encourage her to travel with Cruz to Nashville to meet with

his immigration attorney.  Rodas directed Katia to bring
proof of her military service, her photo identification, and
Kendryk's birth certificate with her to the appointment with
the lawyer and also offered to pay Katia for the day.  Rodas
also told her it was very important for her to bring these
things to the attorney because "they can't send the papers
without your information and Reynaldo is very stressed."
Later that day, Rodas texted Katia that they would be fine as
long as nothing legal came up like --

THE COURT:  Not "as long as."  "They would be fine
as nothing legal came up."  Right?  You said, "As long as,"
and that's not what it says.

MR. KURTZMAN:  I did, Your Honor.

THE COURT:  Is that what you mean, as long as?

MR. KURTZMAN:  Yes, Your Honor.

THE COURT:  Okay.  Go ahead.

MR. KURTZMAN:  Like Katia having a boyfriend who
wanted to get married and reassured Katia that they were
halfway there, likely meaning that they were halfway there to
defrauding immigration authorities and getting Salinas-Cruz
his citizenship.

The following day, on February 8, 2024, Katia
asked to meet with Rodas over the arranged marriage, and
Rodas told Katia to meet at Pablo's Authentic Mexican
Restaurant in Clarksville.  The day after Katia's meeting

with Rodas, Salinas-Cruz texted Katia and told her:

That he was joking about not giving her a divorce from their marriage;

That he would pay her $5,000 if he got a positive result, a citizenship from their fraudulent marriage;

That he thought it was appropriate to pay her for doing him a favor;

That she needed to answer him when he needs information;

That she may need to go alone to meet the immigration lawyer and immigration officials from time to time; and

That she needed to provide him an answer if she is going to help him.

Salinas-Cruz also indicated that he did not want Rodas to know that he was offering Katia this money. This would be the last text message between Katia and Cruz -- and Salinas-Cruz until April 30, 2024, which is evidence that their marriage was fraudulent.

From February 2024 until Katia's death, Rodas and Katia texted continually about their children, Katia's successes in the military, their joint business ventures, and their ongoing efforts to deceive immigration authorities. On February 14, 2024, Rodas contacted Katia and asked her to provide the "deer papers" so they could be forwarded to the

immigration attorney.  Rodas is referring to documents
related to the "Defense Enrollment Eligibility Reporting
System," which is also known as "DEERS," which is the system
used to enroll family members into the military health care
and benefits system.  Presumably, these documents would be
another facet of their efforts to deceive immigration
authorities.  Katia did attempt to enroll Salinas-Cruz into
DEERS based on Army records.  The following day, Rodas
provided the address for Salinas-Cruz's immigration attorney,
and they agreed to meet there.  Katia also assured Rodas that
she would bring Kendryk's birth certificate as well.

    On March 1, 2024, Katia told Rodas that she needed
information from Salinas-Cruz to file her taxes, and Rodas
responded that she should file as "married filing jointly."
Around this time frame, there were also messages from Katia
to Rodas where Katia is asking how long she should tell the
IRS that she has been living with Salinas-Cruz, despite the
fact that she lived in a shared apartment with Wadsworth this
entire time.  On March 21, 2024, Rodas texted Cruz and told
her that the immigration attorney needs two passport pictures
of Katia for Salinas-Cruz's paperwork.

    On April 4, 2024, Rodas continued to encourage
Katia to complete the DEERS paperwork and also provide her --
and also asked her to provide a power of attorney for
Salinas-Cruz to strengthen his immigration paperwork.  It

appears from the text messages that an immigration interview
of Katia and Salinas-Cruz would be occurring once the
paperwork was complete.  During this same conversation, Rodas
told Katia that, if Katia continues to serve in the
United States Army, Kendryk should come to live with her.

In early April 2024, Katia began expressing to
Rodas that she was frustrated with Wadsworth as a roommate.
This frustration appears to be based on Wadsworth's lack of a
job and inability to help with bills.  Rodas responded that
she would help Katia with Wadsworth, but "let's also resolve
the migration issue.  There is only one month left to find
out if they leave you in the service, and we make the plan
for Kendryk."  The "migration" issue is a direct reference to
their efforts to obtain citizenship or a green card for
Salinas-Cruz.  Rodas then encouraged Katia to focus on the
immigration issue and then deal with Wadsworth once
Salinas-Cruz's immigration problem was resolved.

In mid-April 2024, Katia and Rodas remained in
close communication as Rodas planned a party for Kendryk and
Katia -- planned a -- excuse me, planned a party for Kendryk,
and Katia dealt with the future of her Army career.  On
April 19th of 2024, Katia told Rodas that she was going to be
staying in the Army until at least May of 2025.  Katia also
described her desire to become a leader of younger soldiers
and to take care of soldiers in a manner which she felt was

1 lacking in her own experience.

2           On April 26, 2024, Rodas contacted her military

3 psychologist, who she was seeing after Thompson's suicide,

4 and shared that Katia planned to leave Kendryk, her son, with

5 Rodas for at least a week and that she felt very bad for

6 Kendryk that his mother is very irresponsible with him.

7 Again, there is no evidence that Katia planned to go

8 anywhere, either on military duty or for personal travels, in

9 the weeks leading up to her death.  Likewise, this message in

10 late April 2024 is inconsistent with the texts between Rodas

11 and Katia from February 2024 until Katia's death, all of

12 which were recovered from Katia's and Rodas's phone, that did

13 not discuss any plan for Katia to leave Kendryk with Rodas or

14 Rodas's disapproval of Katia's performance as a parent.

15           On April 30, 2024, Salinas-Cruz began texting with

16 Katia again about his citizenship application and

17 communicated, "I need to know if you're going to answer to

18 know if you can give me proof that you work in the military

19 because they are asking me urgently."  This picks up from

20 previous conversations where Salinas-Cruz is asking Katia

21 whether or not she will continue to help him as he tries to

22 obtain his United States citizenship.  Salinas-Cruz and Katia

23 then do not text each other again until the week of Katia's

24 death.  On May 15, 2024, Katia and Salinas-Cruz texted each

25 other and agreed to meet at Katia's apartment.  Notably,

1  Katia had to provide Salinas-Cruz with the address of her

2  apartment and a code to enter through the security gate,

3  which is more circumstantial proof that their marriage was

4  fraudulent.

5          On May 3, 2024, Rodas and Katia discussed

6  immigration documents, and Katia changed the $500,000 portion

7  of her life insurance to make her son, Kendryk, the primary

8  beneficiary and Cruz the alternate beneficiary.  Katia then

9  emailed her changed life insurance documents to Rodas so that

10  Rodas could forward them to their immigration lawyer.

11          During the first week of May, Katia and Rodas

12  texted numerous times about the immigration fraud.  On

13  May 7, 2021, Rodas sent numerous messages about the need for

14  various documents and her willingness to pay Katia for

15  those -- for these documents.  During the week of May 11,

16  2024, Katia informed a fellow soldier that she was in a

17  fraudulent marriage to get someone citizenship.  Katia also

18  told this fellow soldier that her fake husband had asked her

19  to have his baby, and Katia shared his desire with her

20  husband's actual girlfriend, which is Rodas.  Katia told this

21  fellow soldier that Rodas was very upset when Katia shared

22  this with her.

23          Rodas texted Katia on Tuesday, May 14, 2024, and

24  it was clear that Rodas was at Katia's apartment and was

25  interacting with Wadsworth.  Rodas texted Katia that she told

Wadsworth, "She has to leave this weekend, and Wadsworth says you haven't told her anything."  Katia responded that she planned to tell Wadsworth about the eviction when she got home.  During this same conversation, Katia asked to stay at Rodas's home for the week, and Rodas responded, "This is your house.  You are supposed to live here.  It is not necessary to even ask."  Wadsworth texted Katia later in the day and told her that she plans to give her key to the landlord on Monday.

On Wednesday, May 15, 2024, Katia texted Rodas that "we took everything out of the garage."  And Katia is likely referring to she and Cruz loading up her belongings.  The investigation revealed that all of Katia's belongings, with the exception of a shower mat and a shower caddy, were moved to Rodas and Cruz's residence on Wednesday, May 15, 2024.  Wadsworth also explained that all of Katia's belongings were removed from their shared apartment on May 15, 2024, and Wadsworth informed her mother that she would be moving back in with her.

On Thursday, May 16, 2024, Katia and her son slept at Rodas and Salinas-Cruz's home.  On Friday, May 17, 2024, Katia left her son with a new babysitter and went into work.  While at work, at 2:16 p.m., Katia changed the $100,000 portion of her life insurance policy to give half of the money to her son and the other half to Salinas-Cruz.  By

5 p.m., Katia and Rodas were together, and by 7:15 p.m.,
Rodas and Katia met a third woman at Pablo's American
Restaurant in Clarksville.

Following dinner, Rodas and Katia left the
restaurant and headed towards Katia's apartment. While Rodas
was driving, Katia was texting her boyfriend, but her phone
eventually died before she got home. Based on the security
camera footage, Rodas drove through the gate of Katia's
apartment complex at 10:48 and called Wadsworth at
approximately 10:58, but Wadsworth did not answer the call.
Rodas remained inside Katia's apartment complex until
12:18 a.m., or approximately 90 minutes.

On May 18th of 2024, Wadsworth woke up to find the
backdoor of the apartment open, the garage door unlocked, the
front window slightly open, and Katia's phone, which was
dead, outside the front door near the bushes. That morning,
Wadsworth returned Rodas's call, and they spoke for a minute
or two. Wadsworth recalls asking Rodas where Katia was,
since she had found her phone, but Katia's vehicle was not at
the apartment, and Rodas responded that as far as she knew
Katia was with her boyfriend. Wadsworth also noticed that
Katia's bedroom door was locked, which it had not been the
previous day.

In the early afternoon of May 18, 2024, Wadsworth
was invited by her friend to go to the Cheatham Dam with her

1  children and joined her friend on that trip.  Wadsworth and

2  her friend both described that they purchased Little Caesar's

3  pizza as they returned from Cheatham Dam and returned to

4  Wadsworth's apartment.  Wadsworth and her friend each have a

5  boy and a girl, and the kids were playing in the apartment

6  after dinner.  At a certain point, the boys and girls were

7  fighting, so Wadsworth attempted to separate them by putting

8  the girls in her bedroom to play and the boys in Katia's

9  bedroom.  Wadsworth got a utensil to pop the lock and went

10  into Katia's bedroom.  She popped the lock and saw Katia's

11  flip flops in the middle of the room, which had not been

12  there the day before.  Wadsworth continued into the room and

13  looked in the closet where she saw Katia covered with a

14  bathmat.

15          After finding Katia's body, Wadsworth and her

16  friend took the kids out of the house, and Wadsworth called

17  911.  Katia's autopsy determined that she was stabbed over 60

18  times in the chest and throat area, her blood alcohol was

19  very high, and she had Rohypnol, also known as the date rape

20  drug, in her system.

21          After the scene was clear, Wadsworth traveled with

22  officers to the Clarksville Police Department to participate

23  in an interview.  Rodas and Cruz showed up together at the

24  Clarksville Police Department.  Rodas and Cruz agreed to

25  participate in noncustodial interviews.  Salinas-Cruz, in a

1  recorded interview, told law enforcement that Katia's car and
2  possessions were at the house he shared with Rodas; he cared
3  for Katia's son while Rodas and Katia went out on May 17th;
4  that his marriage was fake; and that they had entered into
5  the marriage, or it, only to help him get his United States
6  citizenship.
7          THE COURT:  All right.  Thank you, Mr. Kurtzman.
8          Do you have any questions for the prosecutor,
9  Ms. Harcombe?
10         MS. HARCOMBE:  I do not have any questions.
11         THE COURT:  All right.
12         MS. HARCOMBE:  I would note that Mr. Salinas-Cruz
13 is not stipulating to everything that's in this.
14         THE COURT:  Yes.  Yeah, I'm not going to ask him
15 to.
16         Mr. Salinas-Cruz, the prosecutor gave a very
17 detailed recitation of facts starting a couple of years ago,
18 actually, and I don't expect you to admit all those facts.
19 However, I must be satisfied that you are pleading guilty
20 because you are guilty of the offense -- of the offenses
21 you're pleading guilty to.  So with regard to Count One, the
22 conspiracy to commit marriage fraud, the government would
23 have to prove these elements to a jury beyond a reasonable
24 doubt.  And I'm going to ask you if you think the government
25 could prove these elements to a jury beyond a reasonable

1 doubt if you had gone to trial.

2      First, that two or more people agreed to defraud

3 the United States. Here it's you and -- and Ms. Rodas, your

4 co-defendant.

5      Does the government also maintain that Katia was a

6 co-conspirator? Suppose she was, really.

7      MR. KURTZMAN: She's an unindicted --

8      THE COURT: Unindicted co-conspirator.

9      So, anyway, at least two people agreed to defraud

10 the United States, that you were a party to that agreement,

11 that you joined in this conspiracy knowing that the objective

12 was to defraud the United States and intending to join

13 together with at least one other person to achieve the

14 objective of defrauding the United States by violating the

15 immigration laws, and that at some time during the existence

16 of the conspiracy at least one of the conspirators performed

17 an overt act to further accomplish the objective of the

18 agreement, which was to violate the immigration laws.

19      So knowing that the defendant [sic] would have to

20 prove all those things to a jury beyond a reasonable doubt

21 for you to be found guilty, do you think the government could

22 have done that if you had gone to trial on Count One?

23      THE DEFENDANT: Yes.

24      THE COURT: For you to be found guilty of

25 Count Two, the government would have to prove these elements

1   to a jury beyond a reasonable doubt:

2           That you knowingly married a US citizen, and you

3   entered into this marriage for the purpose of evading the

4   immigration laws.

5           You think the government could have proved those

6   two elements against you if you had gone to trial on

7   Count Two?

8                   THE DEFENDANT:  Yes.

9                   THE COURT:  So you are pleading guilty because you

10  are, in fact, guilty of these two charges?

11                  THE DEFENDANT:  Yes.

12                  THE COURT:  Do you plead guilty to Counts One and

13  Two?

14                  THE DEFENDANT:  Yes.

15                  THE COURT:  The Court finds there is a factual

16  basis for the plea in this case.  The Court has observed the

17  appearance of Mr. Salinas-Cruz and his responsiveness to the

18  questions asked.  Based upon that observation and the answers

19  to the questions, the Court is satisfied that this defendant

20  is in full possession of his faculties and competent to plead

21  guilty; he is not under the apparent influence of narcotics,

22  hallucinogens or alcohol; he understands the nature of the

23  charges to which his plea is offered and the maximum possible

24  penalties provided by law; he is waiving his constitutional

25  rights to trial and the constitutional rights accorded all

1   persons accused of a crime and has offered to plead guilty

2   voluntarily.

3           I will accept the plea today.

4           Can we look at March for the sentencing.

5           MS. HARCOMBE:  Your Honor, if there is an earlier

6   date the Court is available, I believe that the probation

7   office is now caught up, and we don't expect there to be any

8   records that need to be obtained in this case --

9           THE COURT:  Give me a time frame.  I can fit it in

10  whenever you need it.  What do you think?

11          MS. HARCOMBE:  January or February, guys?

12          PROBATION OFFICER DAVIS:  I'm going to defer to my

13  supervisor.

14          PROBATION OFFICER EVERETT:  I would request at

15  least 90 days, if the Court is able to do 90 days.

16          THE COURT:  Okay.  Let's see.  So that would be --

17  February 12th would be 90 days.

18          PROBATION OFFICER EVERETT:  Yes, ma'am, I think

19  late January, February would be fine.

20          THE COURT:  Okay.  How about Friday, February 7th

21  at 2:00?  That work?

22          PROBATION OFFICER DAVIS:  Your Honor, that will be

23  fine.

24          THE COURT:  That work?

25          MR. KURTZMAN:  Works for the government, Your

1  Honor.

2          MS. HARCOMBE:  Works for the defense.

3          THE COURT:  2:00, Friday, February 7th.

4          Okay.  Mr. Kurtzman, I wanted to ask you:  Are

5  these defendants under investigation for either of these

6  murders?

7          MR. KURTZMAN:  Yes, Your Honor.  I expect both of

8  them to be -- I expect a homicide charge to be presented to

9  the Montgomery County Grand Jury in early December.

10          THE COURT:  Charging both of them with murder, or

11  do you know?  You don't need to tell me.

12          MR. KURTZMAN:  I'm not a hundred percent.  I don't

13  know if it's like an accessory after the fact for the

14  defendant here or --

15          THE COURT:  Okay.  All right.

16          And now, Ms. Rojas -- Rojas?

17          MR. KURTZMAN:  Rodas.

18          THE COURT:  Rodas.  She's set for trial on

19  December 31st.  Are you anticipating a trial in this case, in

20  which case we'd probably need to move that trial to a

21  different time?

22          MR. KURTZMAN:  Do I expect -- I'm not sure,

23  Your Honor.  I don't expect it to go then.  I have spoken to

24  Mr. Perry, and he said it's not going to go then, but I don't

25  know if he plans to have his client plead here and then go

1   over to state authorities or -- I'm not -- I'm not quite
2   sure.
3           THE COURT:  But you're -- he's told you it would
4   not be going to trial on December 31st?
5           MR. KURTZMAN:  That is what he's communicated,
6   yes, Your Honor.
7           THE COURT:  All right.  All right.  Is there
8   anything else from the government?
9           MR. KURTZMAN:  No, Your Honor.
10          THE COURT:  Anything else from the defense?
11          MS. HARCOMBE:  No, ma'am.
12          THE COURT:  All right.  We're in recess.
13          Thank you, Ms. Kristy.
14
15          (Proceedings concluded at 2:52 p.m.)
16
17
18
19
20
21
22
23
24
25

1       <u>REPORTER'S CERTIFICATE</u>

2           I, Patricia A. Jennings, Official Court Reporter

3   for the United States District Court for the Middle District

4   of Tennessee, with offices at Nashville, do hereby certify:

5           That I reported on the Stenograph machine the

6   proceedings held in open court on November 12, 2024, in the

7   matter of UNITED STATES OF AMERICA vs. REYNALDO SALINAS-CRUZ,

8   Case No. 3:24-cr-00178-1; that said proceedings in connection

9   with the hearing were reduced to typewritten form by me; and

10  that the foregoing transcript (pages 1 through 30) is a true

11  and accurate record of said proceedings.

12          This the 2nd day of December, 2024.

13

14

15

16

17                  /s/ Patricia A. Jennings
                    Patricia A. Jennings, RMR, CRR
18                  Official Court Reporter

19

20

21

22

23

24

25